IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**BULMARO LEPEZ-ALVAREZ,**

        Petitioner,

   v.

**UNITED STATES OF AMERICA,**

        Respondent.

No. 3:05-cr-00201-MO
No. 3:12-cv-01927-MO

OPINION AND ORDER

**MOSMAN, J.**,

     A jury found Petitioner Bulmaro Lepez-Alvarez guilty [199] of one count of distributing cocaine and one count of distributing five grams or more of methamphetamine on April 24, 2008. I sentenced him [250] to a term of confinement of 360 months on each count, to be served concurrently. Mr. Lepez-Alvarez now moves to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 [281]. For the reasons set forth below, I DENY petitioner's motion.

## BACKGROUND

     In April of 2008, Mr. Lepez-Alvarez was tried before a jury on charges of distributing cocaine and distributing five or more grams of methamphetamine, both in violation of 21 U.S.C. § 841(a)(1). The Government's key witnesses included cooperating informant Adnan Fares and Detective James Danner of the Regional Organized Crime Narcotics Agency ("ROCN").

1 – OPINION AND ORDER

Mr. Fares testified that he had known Mr. Lepez-Alvarez by the name of "Miguel" in 2001. At that time, Mr. Fares was in the business of selling pseudoephedrine pills for use in manufacturing methamphetamine. When ROCN task force members met with Mr. Fares in February of 2005, he informed them that "Miguel" had approached him to inquire about buying pseudoephedrine pills, and also to ask whether Mr. Fares knew anyone interested in purchasing cocaine. ROCN arranged two controlled buy operations, in which Mr. Fares purchased approximately one ounce of cocaine and approximately seventeen grams of methamphetamine from Mr. Lepez-Alvarez.

Detective Danner described the results of a search warrant served on Mr. Lepez-Alvarez's residence soon after the two controlled buys. He and the other officers who executed the warrant found the residence entirely empty, apart from a few photographs, items of clothing, and numerous materials used to manufacture and distribute methamphetamine. The Government first attempted to introduce one of the photographs into evidence during Det. Danner's testimony, but he was unable to declare with confidence that it depicted Mr. Lepez-Alvarez, and the defense's authenticity objection was sustained. The Government successfully introduced evidence of multiple recorded conversations between Mr. Lepez-Alvarez and Mr. Fares establishing that the controlled buys took place.

Mr. Lepez-Alvarez took the stand in his defense, aiming to establish that he sold cocaine and methamphetamine to Mr. Fares only under duress. He testified that he traveled to the United States from Mexico because he had heard that his brother, Leo, was in danger. Upon arrival, he learned that Leo owed Mr. Fares a large amount of money, and that Mr. Fares would hurt Leo if the debt were not repaid. Mr. Lepez-Alvarez claimed that he sold narcotics to Mr. Fares only because he feared that Leo would be harmed if he refused. Mr. Lepez-Alvarez had considered

presenting an entrapment defense, but his counsel represented to me during a hearing on pretrial motions that he had decided not to do so. (Tr. [214] at 18:11–20.)

The Government cross-examined Mr. Lepez-Alvarez concerning his criminal record in the United States, which includes convictions of possession for sale of a controlled substance, delivery of a controlled substance, possession of a firearm as a felon, and illegal reentry. The Government also questioned him about the photograph that it had presented to Det. Danner. He confirmed that he was depicted in the photograph, and I admitted it into evidence.

I issued final instructions to the jury on April 24, 2008, including instructions on the defense of duress. During their deliberations, the jury submitted the following question to the Court on a handwritten note:

> Is the key question: Proof of innocence or guilt based on
> - under duress
> - not under duress

(Minutes Ex. D [200-2] at 1.) I conferred with counsel for the parties, and ultimately answered the question "yes." (*Id.*; Minutes [200] at 1.) The jury returned a verdict of guilty on both counts.

Mr. Lepez-Alvarez timely appealed from his conviction and sentence. The Ninth Circuit affirmed, holding that the Court did not interfere with Mr. Lepez-Alvarez's right to represent himself,[1] that the search warrant served on his residence satisfied the Fourth Amendment, and that his sentence was reasonable. *United States v. Lepez-Alvarez*, 444 F. App'x 175, 176–77 (9th Cir. 2011).

Mr. Lepez-Alvarez's present motion [281] was filed in this Court on October 24, 2012. Finding that it had been filed more than one year after his conviction became final, I denied the

---

[1] Mr. Lepez-Alvarez argued that I interfered with his right to self-representation by conducting a competency hearing before ruling on his motion for leave to represent himself. *See Lepez-Alvarez*, 444 F. App'x at 176.

3 – OPINION AND ORDER

motion [291] as untimely. *See* 28 U.S.C. § 2255(f). The Ninth Circuit reversed [300], finding that Mr. Lepez-Alvarez had submitted his motion to a prison official and the official had mailed the motion within the statutory time limit. *See* R. Gov. § 2255 Proc. 3(d). I therefore turn to the merits of Mr. Lepez-Alvarez's motions.

## DISCUSSION

Mr. Lepez-Alvarez claims that his trial counsel, John Storkel, rendered ineffective assistance in the following ways: (1) failure to communicate with Mr. Lepez-Alvarez; (2) failure to call witnesses in support of the duress defense and to impeach government witnesses; (3) failure to adequately cross-examine government witnesses; (4) failure to object to inadmissible evidence; (5) unreasonable advice that Mr. Lepez-Alvarez should take the stand; (6) and failure to seek clarification of a juror question.[2] (Mot. [281] at 8.) Because numbers (2) and (5) above are closely related, I consider them together.

To prevail on a claim of ineffective assistance of counsel, a section 2255 petitioner must show (1) that counsel's performance was "deficient" and (2) that the deficient performance "prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other." *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002).

To satisfy the deficiency prong, a petitioner must demonstrate that his attorney's actions "were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

---

[2] Mr. Lepez-Alvarez also listed failure to "petition the court for expert witnesses" in the introduction to his motion. (Mot. [281] at 8.) However, he did not offer any facts or argument to support this assertion in either his motion or his reply. He therefore has not alleged sufficient facts to permit an inference that Mr. Storkel unreasonably declined to present expert testimony.

4 – OPINION AND ORDER

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. If counsel conducts a "less than complete investigation," counsel's strategic choices are nonetheless reasonable if "reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

To satisfy the prejudice prong, a petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.

## I.  Failure To Communicate with Mr. Lepez-Alvarez

The Sixth Amendment does not guarantee the accused a right to a "meaningful relationship" with counsel. *Morris v. Slappy*, 461 U.S. 1, 13–14 (1983). Poor relations between counsel and accused violate the Sixth Amendment only if they result in "a total lack of communication or other significant impediment" that renders counsel's assistance ineffective. *Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000). In addition, the deterioration of the attorney-client relationship must not be the result of deliberate sabotage or lack of reasonable effort on the part of the accused. *Id.* at 1027 (citing *Crandell v. Bunnell*, 144 F.3d 1213, 1217–18 (9th Cir. 1998)).

Mr. Lepez-Alvarez argues that Mr. Storkel provided ineffective assistance in failing to communicate with him. (Mot. [281] at 8–9.) He asserts that Mr. Storkel failed to answer or return his calls "many times," and that Mr. Storkel did not inform Mr. Lepez-Alvarez of his decision not to call a number of defense witnesses until "the mid[d]le of trial." *Id.* at 8. Moreover, after trial, Mr. Storkel did not contact Mr. Lepez-Alvarez for four months. *Id.* Mr.

Lepez-Alvarez argues that the paucity of communication with counsel affected his defense "tremendously." *Id.*

Even if Mr. Storkel failed to confer with his client as often as Mr. Lepez-Alvarez would have liked, this failure does not rise to ineffective assistance. Mr. Lepez-Alvarez claims that he provided Mr. Storkel with a list of at least fifteen witnesses that he thought would be helpful to his defense "[w]ay before trial," including their contact information. (Mot. [281] at 10–20.)[3] He also argues that he had repeatedly asked Mr. Storkel to investigate the possibility that law enforcement had targeted him personally in order to entrap him. *Id.* at 22.[4] Rather than "a total lack of communication," these communications reveal that counsel and client discussed strategy in advance of trial. That the results of these discussions were not as Mr. Lepez-Alvarez preferred is of no moment. "[A] lawyer may properly make a tactical determination of how to run a trial even in the face of his client's incomprehension or even explicit disapproval." *Schell*, 218 F.3d at 1026 n.8 (quoting *Brookhart v. Janis*, 384 U.S. 1, 8 (1966) (Harlan, J., dissenting)). The alleged paucity of Mr. Storkel's communications with Mr. Lepez-Alvarez does not amount to deficient performance under the *Strickland* standard.

## II. Failure To Call Defense Witnesses

If supported by a reasonable investigation, trial counsel's tactical choice of which evidence to present is not amenable to attack through an ineffective assistance of counsel claim. *See Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003). In determining what testimony to present, trial counsel need not interview "every conceivable witness," but must exercise reasonable

---

[3] Mr. Lepez-Alvarez also assigns as error Mr. Storkel's failure to call these witnesses. *See infra* at II.

[4] Mr. Lepez-Alvarez also contends that Mr. Storkel's performance was deficient for failing to investigate and present an entrapment defense. *See infra* at III.A.

professional judgment in determining which leads to follow and which to dismiss as unfruitful. *Crittenden v. Ayers*, 624 F.3d 943, 967 (9th Cir. 2010).

      **A.**    *In Support of the Duress Defense*

Mr. Lepez-Alvarez asserts that he presented three potential witnesses to Mr. Storkel to corroborate his duress defense. Abelarda Arreola, a person Mr. Lepez-Alvarez lived with in Mexico, would testify that a person named "Triste" called Mr. Lepez-Alvarez and told him that Mr. Fares had "a price on [his] brother." (Mot. [281] at 10.) This phone call prompted Mr. Lepez-Alvarez to return to the United States. *Id.* Sonja Steed, a relative of Mr. Lepez-Alvarez, would have testified to "the close familial bond" between him and his brother. *Id.* at 16. Laura Apolinar, who had an "on and off relationship" with Mr. Lepez-Alvarez's brother, would testify that "Triste" told her that "a person of Arab descent . . . wanted to hurt" his brother.[5] *Id.* at 18.

Relatedly, Mr. Lepez-Alvarez argues that Mr. Storkel rendered ineffective assistance in advising his client to testify. *Id.* at 27–28. This advice prejudiced Mr. Lepez-Alvarez because it allowed the Government to cross-examine him regarding his criminal record. *Id.* Presumably, Mr. Lepez-Alvarez believes that if Mr. Storkel had offered Ms. Arreola's, Ms. Steed's, and Ms. Apolinar's testimony regarding the danger to his brother, he would not have had to supply the evidence in support of his duress defense himself.

The argument deserves close consideration. Taking the stand indeed exposed Mr. Lepez-Alvarez to thorough impeachment with his lengthy criminal record, and reasonably effective counsel would have been receptive to a way of avoiding that eventuality. However, Mr. Storkel had sound tactical reasons for declining to call Mr. Lepez-Alvarez's suggested witnesses.

---

[5] In his motion, Mr. Lepez-Alvarez refers to his brother as "David." (Mot. [281] at 18.) At trial, his duress defense was based on fear for a brother named "Leo." (Tr. [289-1] at 3.) The record does not make clear whether Leo and David are the same person.

7 – OPINION AND ORDER

The Government argues that Ms. Arreola's and Ms. Apolinar's statements recounting what "Triste" told them would likely have been excluded as inadmissible hearsay. (Resp. [289] at 12.) To the extent that these statements were offered to prove that Mr. Fares had in fact threatened Mr. Lepez-Alvarez's brother, this is so. However, the statements could properly have been admitted for the limited purpose of showing that Mr. Lepez-Alvarez's fear of harm to his brother was well founded. A hearsay objection therefore would not necessarily have kept Ms. Arreola's and Ms. Apolinar's statements from the jury.

Even if "Triste's" out-of-court statements were admitted for their effect on Mr. Lepez-Alvarez, however, they would have been thoroughly undermined by Mr. Fares's testimony that he had dealt with Mr. Lepez-Alvarez extensively in the past, before there was even a whisper about a threat to his brother. (Tr. [217] at 190:19–194:25.) Failure to present those statements was not an unreasonable decision. Ms. Sneed, moreover, could only have established that Mr. Lepez-Alvarez was close to his brother. This fact alone would not have convinced the jury that Mr. Lepez-Alvarez sold narcotics to Mr. Fares solely out of fear for his brother's safety, rather than for simple profit. Mr. Storkel's failure to arrange for Ms. Sneed's testimony also was not unreasonable.

Mr. Lepez-Alvarez has failed to present facts permitting an inference that counsel's decision not to call the witnesses he suggested in support of his duress defense was anything less than a reasonable strategic decision based on reasonable investigation. He has not shown that Mr. Storkel's failure to call these witnesses was ineffective assistance. Without these witnesses, the only evidence of duress available was Mr. Lepez-Alvarez's testimony; Mr. Storkel's advice that his client take the stand therefore was also a reasonable tactical decision.

### B. *To Impeach Government Witnesses*

Mr. Lepez-Alvarez argues that Mr. Storkel rendered ineffective assistance in failing to call numerous witnesses for the purpose of impeaching or offering alternative explanations for government testimony. He asserts that Elias Fares, Adnan Fares's brother, would have testified that Mr. Lepez-Alvarez made his living in auto repair and that he had never dealt in controlled substances with Mr. Fares before he learned of a threat to his brother. (Mot. [281] at 12.) Nahie Fares, also Adnan Fares's brother, would have testified that he was not aware of any prior dealings between Mr. Lepez-Alvarez and Mr. Fares, and that he would have known of such dealings had they existed. *Id.* at 13–14. Similarly, Terry Lipscomb, a former employee of Mr. Fares, would have testified that he did not know Mr. Lepez-Alvarez and that he would have been aware of any business dealings between Mr. Fares and Mr. Alvarez in the past. *Id.* at 19–20.

Mr. Storkel had sound tactical reasons for declining to call each of these witnesses. Concerning Elias Fares, Mr. Storkel told the Court that whether he would present Elias's testimony would depend on what Elias said to his investigator. (Tr. [216] at 153:3–6.) This indicates that Mr. Storkel determined for himself what testimony Elias was likely to give, and decided against presenting it. That Mr. Lepez-Alvarez's employment in auto repair is entirely irrelevant to whether he sold drugs strengthens the presumption of reasonableness that must be afforded this decision. Mr. Storkel declined to call Nahie Fares because he believed under the circumstances that Nahie was likely to testify for the Government and that he would not speak to an investigator. *Id.* at 73:21–25. This was also a tactical decision based on reasonable investigation. Finally, Mr. Storkel gave the Court numerous reasons why he was unwilling to call Mr. Lipscomb, including that Mr. Lipscomb "came across as way too hardened," that he had a "huge criminal history," and that he did not provide the investigator with any specific

information that would have been useful in impeaching Mr. Fares. *Id.* at 152:9–18. These are all eminently sound reasons for declining to sit Mr. Lipscomb in front of a jury.

Mr. Lepez-Alvarez also suggests that Mr. Storkel was ineffective in failing to call numerous other witnesses. Isam Sarkis would have testified that Mr. Fares is "a liar by nature," and George Trad would have testified that Mr. Fares lied to him about whether pseudoephedrine could be legally transported across the Canadian border. (Mot. [281] at 14–15.) Natasha Devlaeminch, Laura Janhson, Cyndy Olsen, Johana Jean Anderson, and Danielle Lynn Anderson each would have testified that Mr. Fares lied at trial about how many cases of pseudoephedrine he had imported into the United States from Canada. *Id.* at 15. Finally, Anthony James Coffman would have rebutted Det. Danner's description of Mr. Lepez-Alvarez's residence as a "stash house." *Id.* at 10–11. Mr. Coffman would have testified that he owned the residence, and that he had recently moved all of the furnishings to a new house in the state of Washington. *Id.* at 11.

Leaving aside whether Mr. Storkel's decision not to call these witnesses was reasonable, it caused Mr. Lepez-Alvarez no prejudice because the witnesses' testimony would not have affected the outcome. Any testimony seeking to show that Mr. Fares lied about the legality of importing pseudoephedrine or about how much pseudoephedrine he had imported would be inadmissible as extrinsic evidence of a specific instance of conduct. Fed. R. Evid. 608(b). Mr. Sarkis's testimony might be admissible as evidence of a reputation for untruthfulness, Fed. R. Evid. 608(a), but would also be cumulative. Mr. Storkel presented other evidence of Mr. Fares's reputation for untruthfulness at trial, and the jury was aware that Mr. Fares was testifying pursuant to an agreement with the Government. (Tr. [216] at 44:14–46:7, [217] at 278:4–6.) Mr. Lepez-Alvares's defense therefore would not have gained anything significant from Mr. Sarkis's testimony. Finally, Mr. Coffman's testimony would have been of very marginal

relevance. Mr. Lepez-Alvares does not dispute in his motion that his residence contained methamphetamine paraphernalia. The precise reason why it did not also contain furniture was of little importance at trial.

Each of the witnesses Mr. Lepez-Alvares contends would have impeached the Government's evidence either would not have been an effective witness for tactical reasons or would not have created a reasonable probability of a different outcome. Mr. Storkel therefore did not render ineffective assistance in declining to call them, or did not prejudice Mr. Lepez-Alvares in doing so.

      C.    *As a Character Witness*

Mr. Lepez-Alvarez takes issue with Mr. Storkel's decision not to call Laura Mckain, from whom Mr. Lepez-Alvarez once rented a building. (Mot. [281] at 17.) Ms. Mckain told Mr. Storkel's investigator that she would be willing to tell the jury that Mr. Lepez-Alvarez is "a hard working man" and a law abiding citizen. *Id.* He asserts that this testimony would have bolstered his character. *Id.*

Given that Mr. Storkel investigated what testimony Ms. Mckain had to offer, his decision not to present it must be presumed reasonable. In any event, had he elicited testimony about Mr. Lepez-Alvarez's good character from Ms. Mckain, the Government likely would have cross-examined her regarding Mr. Lepez-Alvarez's extensive prior convictions. Mr. Storkel therefore had a sound tactical reason for declining to offer her testimony. His decision to do so was not deficient performance.

**III.**    **Failure To Cross-Examine Government Witnesses**

Mr. Lepez-Alvarez argues that Mr. Storkel rendered ineffective assistance in failing to ask certain questions of Government witnesses on cross-examination. In particular, he asserts

11 – OPINION AND ORDER

that Mr. Storkel should have cross-examined Det. Danner concerning the search warrant, and Mr. Fares concerning inconsistencies between his testimony at trial and his statements in recorded telephone conversations.

### A.  *Detective Danner and the "John Doe" Search Warrant*

The search warrant directed at Mr. Lepez-Alvarez's residence also permitted officers to search "[t]he person of Miguel 'John Doe [sic], a Hispanic male." (Mot. Ex. 1 [281-1] at 26.) Mr. Lepez-Alvarez contends that Det. Danner knew Mr. Lepez-Alvarez's identity when he obtained the warrant, and that directing it at "John Doe" was unnecessary. (Mot. [281] at 21–22.) Mr. Lepez-Alvarez believes that Det. Danner's knowledge of who "Miguel" was before obtaining the warrant shows that the police targeted him. *Id.* at 23. He believes further that if Mr. Storkel had elicited from Det. Danner that he knew "Miguel's" identity, Mr. Lepez-Alvarez would have been entitled to a jury instruction on entrapment. *Id.* at 23.

The defense of entrapment has "two elements: government inducement of the crime and absence of predisposition on the part of the defendant." *United States v. Gurolla*, 333 F.3d 944, 951 (9th Cir. 2003) (citing *United State v. Poehlman*, 217 F.3d 692, 693 (9th Cir. 2000)).[6] In order to be entitled to an instruction on entrapment, the defendant must produce "some evidence" to support both elements. *Gurolla*, 333 F.3d at 955. Where the defendant produces the "slight evidence" needed to "create the factual issue necessary to get the defense to the jury," the court must give the instruction, "even though the evidence is weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Becerra*, 992 F.2d 960, 963 (9th Cir. 1993).

Here, even if Mr. Storkel had elicited from Det. Danner that he knew Mr. Lepez-Alvarez's identity before obtaining the warrant, he would not be entitled to an entrapment

---

[6] Note that the *Gurolla* court cites the syllabus of the *Poehlman* opinion, not the opinion itself. *Poehlman* discusses the elements of the entrapment defense at page 697 of the opinion.

12 – OPINION AND ORDER

instruction. Even under the lenient standard of "slight evidence," mere knowledge of who Mr. Lepez-Alvarez was is not sufficient to raise a factual issue as to whether Det. Danner induced him to sell narcotics to Mr. Fares. Further, pursuing the entrapment defense would have placed Mr. Lepez-Alvarez's predisposition to deal in narcotics at issue, which in turn would have opened the door for the Government to present the details of his prior narcotics convictions. Mr. Storkel referred to this fact as his primary reason for declining to pursue entrapment. (Tr. [214] at 18:21–25.) In light of Mr. Lepez-Alvarez's history, that a jury would believe that he was not predisposed to sell cocaine and methamphetamine to Mr. Fares is not reasonably probable. Even if eliciting Det. Danner's foreknowledge of Mr. Lepez-Alvarez's identity would have supported an entrapment instruction, Mr. Storkel's failure to do so did not result in prejudice.

Mr. Lepez-Alvarez also contends that, had Mr. Storkel elicited that Det. Danner knew Mr. Lepez-Alvarez's identity, Mr. Storkel could have had the case dismissed because the warrant was invalid. (Mot. [281] at 23.) However, on direct appeal in this case, the Ninth Circuit held that the warrant satisfied the requirements of the Fourth Amendment. *Lepez-Alvarez*, 444 F. App'x at 176. Mr. Lepez-Alvarez has not explained how substituting his real name for "John Doe" would render the warrant deficient. Mr. Storkel's decision not to pursue this argument therefore did not prejudice Mr. Lepez-Alvarez.

   **B.**  *Inconsistencies in Mr. Fares's Testimony*

Mr. Lepez-Alvarez points out three inconsistencies between Mr. Fares's trial testimony and various items of evidence. (Mot. [281] at 24–26.) First, he asserts that Mr. Fares's statement to police that he had "had prior dealings with [Mr. Lepez-Alvarez] in 2003" could not be correct because he was incarcerated throughout 2003. *Id.* at 24. Second, he recalls Mr. Fares's testimony that Mr. Lepez-Alvarez called him at ten o'clock in the evening on March 1,

13 – OPINION AND ORDER

2005, and asserts that telephone records show that Mr. Lepez-Alvarez made no such call. *Id.* at 25.  Third, he claims that Mr. Fares's testimony that he first did business with Mr. Lepez-Alvarez in 2001 contradicted his statement to the police that their first dealings were in 2003. *Id.* at 26. He argues that pointing out these inconsistencies would have "demonstrate[d] [Mr. Fares's] willingness to change his testimony to make himself appear more credible." *Id.*

Whether or not Mr. Storkel's decision not to confront Mr. Fares with these inconsistencies was deficient performance, it did not prejudice Mr. Lepez-Alvarez.  Mr. Storkel presented other evidence of Mr. Fares's reputation for untruthfulness, and the jury was aware that Mr. Fares was testifying because of an agreement with the government.  That minor discrepancies in Mr. Fares's testimony would have caused significant additional damage to his credibility in the eyes of the jury is not reasonably likely.

## IV.     Failure To Object to Inadmissible Evidence

Mr. Lepez-Alvarez argues that Mr. Storkel rendered ineffective assistance in failing to object to the introduction of two exhibits: half an ounce of cocaine, and a photograph found at his residence.

"An attorney's failure to object to the admission of inadmissible evidence is not necessarily ineffective." *Morris v. California*, 966 F.2d 448, 456 (9th Cir. 1991).  Trial counsel may have sound tactical reasons for failing to object even where evidence is clearly inadmissible. *Id.*  Where the evidence is in fact admissible, of course, failure to object causes no prejudice.

Mr. Lepez-Alvarez contends Mr. Storkel should have objected when the Government offered a photograph of half an ounce of cocaine.  (Mot. [281] at 26.)   I understand his argument to be that the Government did not sufficiently authenticate the photograph, rendering it inadmissible.  *See id.* (arguing that Mr. Lepez-Alvarez and Mr. Storkel "[did not] even know

where it came from"). In fact, the Government established that the cocaine pictured was relevant to the case against Mr. Lepez-Alvarez. Det. Danner testified that, about a week before the first controlled buy, Mr. Fares received a half-ounce sample of cocaine from Mr. Lepez-Alvarez. (Tr. [216] at 50:6–11.) Mr. Fares then gave the sample to Det. Danner and his supervisor. *Id.* at 50:10–13. When the Government showed Det. Danner the cocaine photograph, he confirmed that the photograph depicted the half-ounce sample that he had obtained from Mr. Fares. *Id.* at 61:7–14. Det. Danner's testimony therefore established that the cocaine pictured was relevant to the drug transactions underlying the charges against Mr. Lepez-Alvarez. The photograph of the cocaine sample was admissible, and Mr. Storkel's failure to object to its admission cannot have prejudiced Mr. Lepez-Alvarez's defense.

      Mr. Lepez-Alvarez argues that Mr. Storkel's performance was deficient also in his failure to object to the admission of a photograph of three people that was found when the search warrant was served on his residence. (Mot. [281] at 26–27.) He observes that I excluded the photograph when the Government first introduced it because Det. Danner was unable to identify any of the people it depicted with confidence. *Id.* at 26. Mr. Lepez-Alvarez appears to believe that this ruling prevented the Government from attempting to introduce the photograph again. Of course, this is not so. When the Government showed the photograph to Mr. Lepez-Alvarez on cross-examination, he confirmed that he was one of the people depicted within it. That admission established that the photograph was relevant, and I admitted it accordingly. Because the photograph became admissible evidence at that time, Mr. Storkel's failure to object to its admission cannot have prejudiced Mr. Lepez-Alvarez.

15 – OPINION AND ORDER

V.   **Failure To Communicate with Jurors**

During their deliberations, the jury sent a note to the Court setting forth the following question: "Is the key question: Proof of innocence or guilt based on under duress [or] not under duress." (Minutes Ex. D [200-2] at 1.) After conferring with the parties, I answered "yes." (*Id.*, Minutes [200] at 1.) Mr. Lepez-Alvarez argues that Mr. Storkel should have sought clarification of the question rather than agreeing that the answer was "yes." (Mot. [281] at 29.) He asserts that the jurors' question shows that they "gave some thought to the duress defense," and that understanding exactly what the jury was asking was "critical." (Reply [290] at 30.)

Mr. Storkel's failure to request that the jurors be directed to clarify their question does not amount to ineffective assistance. The jurors' question, inartfully phrased as it may be, suggests that they were convinced that Mr. Lepez-Alvarez had committed the charged crimes and that the only remaining issue was whether he had done so under duress. This appears to be precisely what Mr. Lepez-Alvarez was aiming for, because he admitted during his testimony that he supplied Mr. Fares with cocaine and methamphetamine but asserted that he did so out of fear for his brother. (Tr. [289-1] at 8.) It was with this understanding of the question that Mr. Storkel urged that the answer should be "yes." (Tr. [218] 379:19–380:16.) Mr. Lepez-Alvarez offers no alternative interpretation, and no argument as to exactly how clarifying the question might have led to a different outcome. He has not overcome the presumption of competent assistance with regard to Mr. Storkel's response to the jurors' question.

VI.  **Evidentiary Hearing**

A § 2255 petitioner is entitled to a hearing on his claim "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). The Ninth Circuit "[has] characterized this standard as requiring an evidentiary

16 – OPINION AND ORDER

hearing where 'the movant has made specific factual allegations that, if true, state a claim on which relief could be granted.'" *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003) (quoting *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984)).  Accordingly, a hearing must be granted "unless the movant's allegations, when viewed against the record, do not state a claim for relief or are so palpably incredible or patently frivolous as to warrant summary dismissal." *Schaflander*, 743 F.2d at 717.  "'Merely conclusory statements in a § 2255 motion are not enough to require a hearing.'" *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993) (quoting *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1981)).

No evidentiary hearing is warranted here.  On each of Mr. Lepez-Alvarez's claims, either the record conclusively rebuts his arguments or his allegations are insufficient to state a ground for relief.

## CONCLUSION

Because his allegations of ineffective assistance fail to state a ground for relief, I DENY Mr. Lepez-Alvarez's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 [281].  I also DENY a certificate of appealability because Mr. Lepez-Alvarez has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this   11th   day of December, 2013.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge

17 – OPINION AND ORDER